## The Bank of Rome vs. The Village of Rome.

By an act of the legislature, passed in 1853, the president and trustees of the village of Rome were authorized to subscribe for, and hold, stock in the O., C. and R. Rail Road Company to an amount not exceeding $150,000, and to provide for the payment of such stock by issuing corporation bonds. Commissioners were appointed, who were empowered to sell the bonds, or exchange them for stock in the rail road. But it was provided they should have no power to negotiate, sell, or transfer such bonds, or create any liability, except upon the express condition that $500,000 should have been first subscribed by others, to the capital stock of the rail road company; and that before negotiating or transferring any of the said bonds the commissioners should make and subscribe a certificate, in writing, that such subscription of $500,000 had been actually made, and that in their judgment and belief the same had been made in good faith, and by persons able to pay their subscriptions; which certificate was to be filed with the clerk of the village. The commissioners having made and filed the certificate required by the act; *Held*, in an action against the Village of Rome, upon one of the bonds issued in pursuance of the act, that the making and filing of the certificate by the commissioners, was *conclusive* on the parties to the suit, as to the fact stated in it; and that the defendants could not go behind the certificate and show that in point of fact valid subscriptions to the amount stated had not been made.

BY an act of the legislature, passed in 1853, (*Laws of* 1853, *p.* 596,) the president and trustees of the village of Rome were empowered and authorized to subscribe for, take and hold, stock in the Ogdensburgh, Clayton and Rome Rail Road Company, to an amount not exceeding $150,000. (§ 1 *of the Act.*) By the second section of the act, the trustees were empowered to provide for the payment of the stock by issuing corporation bonds, under the seal of the corporation, signed by its president and treasurer, approved by the commissioners named in the act, and to be issued at such time as the commissioners should direct. (§ 2.) The third section names five persons to be styled the "commissioners of the rail road fund of Rome." These commissioners are authorized to sell the bonds or exchange them for an equal amount of the stock of the rail road. By the fourth section the commissioners are made personally responsible to the defendant for the faithful discharge of their duties under the act, and they are remov-

able by the board of trustees. The eighth section declares that "the board of trustees shall have no power to make such subscription as is authorized in the first section of this act, until it has been previously approved by two thirds of all electors who shall have paid a tax on personal or·real estate in said village, whose names shall appear regularly in the last village assessment roll for the year next preceding the one in which the vote is taken." The ninth section provides for an election at which the electors are to vote upon the question of approving or disapproving of the act, and provides that " the trustees, after the votes shall be canvassed, shall immediately thereafter certify and return to the clerk of the board of said trustees the aggregate number of votes taken, designating how many were for and how many against, taking rail road stock."

The tenth section is as follows : " The president and trustees shall, within two days after the return of said trustees to their clerk, meet and proceed to canvass the votes thus certified and returned, and shall make out and file in the office of the clerk of Oneida county their certificate, setting forth that this act is approved or not approved, as the case may be. And *if it shall appear from such certificate* that this act has been approved, and the issue of stocks authorized, the president and trustees of said village shall proceed to make subscription and to issue bonds, as authorized by this act."

By the eleventh section it is " provided that the said commissioners shall have no power or authority to negotiate, sell, or transfer the said bonds, issued under this act, or create any liability whatever, except upon the express condition that five hundred thousand dollars shall have been first subscribed to the capital stock of the company, specified in the first section of the act, and exclusive of the subscription thereto authorized by this act ; and the said commissioners, before negotiating or transferring any of said bonds, shall make and subscribe a certificate, in writing, that such subscription of five hundred thousand dollars has been actually made to the capital stock

of said company, and that in their judgment and belief the same has been made in good faith and by persons of ability sufficient to pay their several subscriptions in full, which certificate shall be filed with the clerk of the board of trustees of the village of Rome." The twelfth section declared that the act should take effect immediately. This action was upon one of the bonds issued under the act, (for $1000,) to recover the interest due July 1st, 1856, and was tried at the Oneida county circuit, before Justice BACON and a jury. It was admitted that the defendant was a corporation ; (*Charter, Laws of* 1853, *p.* 150 ;) also that the legislature passed the act authorizing the subscription to the stock by the defendant. It was also admitted that an election under the act was held on the 16th of June, 1853. The fact was admitted that the rail road company was incorporated; also that the defendant, on the 2d of February, 1854, subscribed for $150,000 of the stock of the road; and in November, 1854, made the bond in suit, with others, to provide for payment of the same. It was also admitted that the commissioners approved the bonds, and issued and delivered the same to the rail road company in exchange and payment for an equal amount of stock. The above facts are admitted by the pleadings. The bond was negotiable by delivery. The plaintiff gave in evidence the certificate of the president and trustees, made the 17th of June, 1853, and filed in Oneida county clerk's office, July 7, 1853, showing a canvass of the votes and that the act was approved. Also the certificate of the commissioners of the rail road fund, made the 26th of November, 1853, and filed with the clerk of the board of trustees the 28th of the same month, whereby they certified that they had examined the original subscriptions to the capital stock of the rail road, and that $500,000 had been subscribed; and that in their judgment and belief the same had been made in good faith and by persons of sufficient ability to pay their several subscriptions in full. The plaintiff also read in evidence the bond and coupon set out in the complaint.

The defendant moved for a nonsuit on the grounds, 1st. That the facts proved did not give the plaintiff a right to recover. 2d. That the plaintiff was bound to show affirmatively that the condition mentioned in the first clause, § 11 of the act of 27th of May, 1853, had been complied with before the bonds were issued.   3d. That the plaintiffs were not bona fide holders of the bonds: that the evidence did not show that the plaintiffs were bona fide holders.   4th. It being a question of power, and the plaintiff having failed to show that the commissioners had jurisdiction to issue said bonds, by proving that $500,000 had been subscribed as required by said § 11 of the act of May 27, 1853, the plaintiff should be nonsuited.   The court denied the motion for a nonsuit: to which decision and ruling the defendant's counsel excepted.   Thereupon the defendant offered to show that on the 26th of November, 1853, (the date of the certificate of the commissioners,) there had not been in fact $500,000 subscribed to the capital stock of the rail road in question: that a nominal amount of over $600,000 had been subscribed in form, and of that amount a portion, to wit, $300,000, had been subscribed after the filing of the articles of association, and on which no part of the ten per cent required by the statute was paid by any of the subscribers at the time of making their subscriptions, or before the 26th of November, 1853; and of which amount of $300,000 about $35,000 were subscriptions made upon conditions as to the location of the rail road, contained in the writing subscribed.   The plaintiff objected to said evidence on the ground that it would constitute no defense; 1st. As to bona fide holders, the fact that nominal subscriptions were really illegal, was no defense.   2d. The certificate was conclusive as to bona fide holders.   3d. That the defendant was estopped from denying the truth of the certificate, it appearing on their record. 4th. That the facts were no defense.   The defendant's counsel insisted that the plaintiff was not a bona fide holder of the bond.   The court held and decided that said certificate of the commissioners was conclusive upon the defendants; and di-

rected a verdict for the plaintiff for the amount claimed in the first count of the complaint: to which decision the counsel for the defendant excepted.

*O. H. Bailey,* for the plaintiff.

*Pomeroy & Southworth,* for the defendant.

*By the Court,* BACON, J. I shall spend no time in discussing or considering the various topics which are dwelt upon in the first 20 pages of the appellant's brief, submitted in this case. Those propositions have, for the present, all been disposed of in this court, and their final adjudication abides the judgment of the court of appeals, to which, it is understood, a case involving these points has been, or is to be taken.

The only real question in this case arises on the ruling of the court, that the making and filing of the certificate of the commissioners of the rail road fund of Rome, that $500,000 had been subscribed to the stock of the Ogdensburgh, Clayton and Rome Rail Road Company, in good faith, and by persons of sufficient ability to pay their several subscriptions, was conclusive on the parties to this suit, as to that fact, and that the defendants could not go behind that certificate, and show that, in point of fact, valid subscriptions to the amount stated had not been made. This certificate was made in pursuance of the 11th section of the act, which prescribed the duties of these commissioners, and provided that before negotiating the bonds of the Village of Rome, they should make and subscribe a certificate of the import above mentioned, and file the same with the clerk of the village of Rome.

My opinion at the circuit was, and still is, that the act intended that this certificate should furnish the evidence, and be held declarative of the fact, that such subscriptions had been made—that these commissioners, who acted as the representatives in effect, and on behalf of the defendants, were

expressly constituted by the act the parties to examine and become satisfied that the amount required by law had been subscribed to the stock of the company; and it never could have been the intent of the lawmakers that every dealer in the bonds of the village should take them at the risk of having them declared invalid, if it should turn out that for some reason, utterly unknown to him and incapable of ascertainment by any means within his control, a portion of the subscriptions, (it might be to the amount of a hundred dollars,) was invalid, or incapable of being collected. It cannot be that every holder of these bonds may be called on to litigate not only the amount, but the *bona fides* of every subscription, up to the $500,000 which the rail road company were required to have before the commissioners could be called on to make their certificate and negotiate the bonds. If such a contingency had been supposed to be attached to the possession of these bonds, it may be safely affirmed that not a dollar of them would ever have passed from the hands of the commissioners. I do not say that this might not ultimately have been highly to the advantage of the citizens of Rome; but we must remember that at the time of the passage of the act in question, it was deemed to be greatly for the benefit of the inhabitants of that village, that the rail road should be pushed rapidly forward, and they probably felicitated themselves on the great gains and profits which were likely to accrue to the corporation from holding stock in a road which would not only always be sure to pay the interest on their bonds, but ultimately contribute to the treasury of the village a handsome annual surplus above the interest, by way of dividends on the stock subscribed to the road by the village authorities. Time has of course served to dispel these visions; but they were not the baseless fabric they have since become, at the time these bonds were issued and the subscription made, to meet which they were executed. The strong desire of the defendant was to raise money on its negotiable bonds, and the object of the law

was, not to create obstacles in the way of the attainment of that desire, but to facilitate its accomplishment. But no man would have been insane enough to take these bonds, if he supposed that upon him was to be cast the burden of sustaining, by proof, not only the good faith with which the subscriptions were made, but the actual ability of every person whose name appeared upon the roll, to pay his subscription. In my judgment, the act intended to provide a simple process, as well as a decisive test, by which not only the defendant should be saved from imposition, but every holder of, or dealer in, the bonds should be warranted, on ascertaining that the certificate had been made and filed pursuant to the act, in dealing freely in them, without incurring the extraordinary risk of having them defeated by showing either that the commissioners were imposed upon, or were themselves participants in a gross fraud upon the public. These commissioners were the agents of the defendant, and their act was substantially the affirmation of the defendant that the conditions of the act had been complied with, and as between them and the innocent holders of the bonds it creates a moral, if not a legal, estoppel of the most emphatic and decisive character.

In the case of *Jones* v. *Dana*, (24 *Barb.* 395,) one question was whether the certificate of the commissioners who were designated to receive the premium notes, &c. of a mutual insurance company, was not conclusive as to the authority of the company to commence business, and whether the court could, at the instance of a third party, go behind that certificate and impeach the proof upon which it was professedly founded. Judge Allen held it to be conclusive, until impeached and overthrown by a direct proceeding instituted by the people or their representatives for that purpose. "It was not intended," he says, "to leave the fact of the possession by the company, of the requisite amount of premium notes, at the time of its organization, to be proved as a matter *in pais,* or to leave it an open question, liable to contestation by every in-

dividual having dealings with the corporation. The legislature provided a tribunal for the adjudication of this question, and its determination is final." These remarks, it seems to me, are strikingly applicable to the case before us, and vindicate the reason and policy of the law we have been considering. If right in this conclusion, then no error was committed in refusing to nonsuit the plaintiffs, or in excluding the evidence offered by the defendant.

It was assumed, upon the trial, that no further proof was required on the part of the plaintiffs, to show that they were *bona fide* holders of the bonds, than its production, and proof of its execution. It is an evidence of debt, which the bank clearly had the power to deal in by its charter, and it was negotiable on its face, and passed by delivery. No circumstances were shown casting suspicion upon the title of the plaintiff, and until some such proof was made, by the defendant, the plaintiff was not called upon to fortify his title. Such is clearly the rule in regard to commercial paper ; and I am not aware that any different rule has been established in regard to negotiable bonds, or other evidences of debt. In the case of *Caryl* v. *McElrath*, (3 *Sandf*. 176,) the question arose, whether a party who had purchased a negotiable security of an insurance company who were prohibited from transferring certain securities without a previous resolution of the board of directors, was a *bona fide* holder, and the court decided that he was to be presumed to be such holder without notice, and that his title could only be impeached by the other party showing that he did not purchase in good faith.

I am of opinion that the judgment in this case should be affirmed.(*a*)

[ONONDAGA GENERAL TERM, April 6, 1858. *Bacon, W. F. Allen* and *Mullin*, Justices.]

(*a*) Affirmed by the court of appeals, October, 1858.